that the damages remained excessive after the entry of the remittitur.

1. The questions thus raised were ably argued but after examination of the record we have reached the conclusion that there was no error in refusing to direct a verdict for defendant, and therefore none in overruling the motion for a new trial based on the same ground. While upon the testimony the question of plaintiff's right to recover may be a close one, we think the ruling of this court in the very similar case of Southern Railway Co. v. Smith, 205 Fed. 360, 123 C. C. A. 488, must control us, and we are content to rest our decision upon it without repeating what was there said.

2. The second error assigned is that the court should have granted a new trial upon the ground that the amount of the verdict was excessive, evincing caprice, passion or prejudice in plaintiff's favor in the minds·of the jury, and that the amount remitted from the damages assessed still left the amount excessive. Respecting this, we repeat what was said by this court in Big Brushy Coal & Coke Co. v. Williams, 176 Fed. at page 533, 99 C. C. A. 102, and in Mason v. Smith, 191 Fed. at page 504, 112 C. C. A. 146, and by the Supreme Court in Holmgren v. United States, 217 U. S. 521, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778, to the effect that this case falls within the settled rule that granting or refusing a new trial is matter of discretion and not subject to review.

The judgment of the District Court is affirmed.

---

## BURKE ELECTRIC CO. v. INDEPENDENT PNEUMATIC TOOL CO.

(Circuit Court of Appeals, Second Circuit. March 15, 1916.)

No. 117.

1. PATENTS ☞76—VALIDITY—PRIOR SALE—"ON SALE."

A contract for sale of articles subsequently patented, subject to approval by the buyer of·a sample to be afterward submitted, is not a putting "on sale" of the invention, and does not invalidate the patent, where the sample is not furnished or approved until within two years prior to the filing of the application.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92, 98; Dec. Dig. ☞76.

For other definitions, see Words and Phrases, Second Series, On Sale.]

2. PATENTS ☞101—VALIDITY—SPECIFICATIONS.

A patent for an electric motor *held* not invalidated by a too broad claim in the specification of the current frequencies at which the motor will operate, where the claim was made in good faith.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. ☞ 101.]

3. PATENTS ☞328—VALIDITY AND INFRINGEMENT—UNIVERSAL MOTOR.

The Burke patent, No. 1,053,940, for a universal motor, *held* not anticipated, to disclose invention, and to be valid as against the claims of prior use and insufficiency of the specification; also *held* infringed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

232 F.—10

Appeal from the District Court of the United States for the Southern District of New York.

Bill by the Burke Electric Company against the Independent Pneumatic Tool Company. Decree for complainant, and defendant appeals. Affirmed.

The following is the opinion of Learned Hand, District Judge, in the court below:

In this case there can be no question of the defendant's infringement, and therefore the case necessarily resolves itself into the issue of invalidity. The patent is attacked upon three grounds: Prior sale; improper specifications; lack of invention. In the last defense are included the so-called Birtman and United States Standard Electric Company uses, which are not strictly such, but are rather anticipations. There are also included the Latour patent, and the claim that the patent is only for a new use of that patent.

The first defense is that the patentee had the patented article "on sale" before September 9, 1907, the application being filed September 9, 1909. This defense rests upon the documents extracted from the plaintiff of his order to Barker for the first 100 motors ever made. Burke's own testimony was extremely vague about the whole matter, but I cannot say that it was insincere; on the contrary, he impressed me favorably. It appears that on June 27, 1907, Barker had written to Burke, asking about getting some of these motors, and the letter had been awaiting an answer for Burke's return. On June 6, 1907, the earliest fixed date, Burke wrote that the work upon the modified sample had been pushed along, and that the first motor would be sent on the 15th for Barker's approval. Burke in that letter "confirms our proposition" to furnish 100 motors, subject to approval of the first sample, showing that at some earlier time he had already made such a proposal. No sample motor had reached Barker by July 23d, and we have every reason to suppose that the "modified sample," when actually sent, was motor No. 1, shipped with another on September 26, 1907. My reason for saying this is that the letter of July 6th does not, in my judgment, distinguish between "the modified sample" and "the first of these light-weight machines for your approval"; on the contrary, it is "this first sample" which is to be "subject to your approval." On the entry of the order, No. 5114, appear the words "Date entered, August 29/07," which the defendant urges to have been necessarily the date of the closing of the contract. It is, of course, possible that Barker had accepted before that date, but it is also possible that it was only a factory direction. If that direction was in pursuance to Barker's acceptance, it still does not follow that he had passed upon the sample which he was to approve. We have, on the contrary, reason to suppose that he had not got such a sample, since, as I have said, the sample was apparently to be only the first of the series ordered, and we know that the first of the series was delivered on Septembr 26, 1907.

[1] The situation for the defendant at best is then only this: Before September 9, 1907, Barker and Burke had concluded an agreement to buy and sell 100 motors, subject to Barker's approval of the kind to be delivered. This I cannot think to have been putting the motor "on sale" under any of the cases. In Plimpton v. Winslow, 14 Fed. (C. C.) 919, the skates on the price list were already completed; in Dittgen v. Racine Paper Goods Co., 181 Fed. (C. C.) 394, many pouches had been sold; in Covert v. Covert (C. C.) 106 Fed. 183, the jack was actually exposed for sale in a shop; in Burton v. Greenville (C. C.) 3 Fed. 642, Bruce had actually sold lamp posts as early as November, 1874. The grain elevator in Barnett-McQueen Co., Limited, v. Canadian Stewart Co., 13 Canadian Exch. 186, had been completed for over a year before the application. In National Cash Register Co. v. American Cash Register Co., 178 Fed. 79, 101 C. C. A. 569, Juengst had actually delivered the machine to the Kruse Company more than two years before application filed. None of these cases fit the case at bar. Judge Lowell's decision in McCreery Eng. Co. v. Mass. Fan Co. (C. C.) 186 Fed. 846, held that taking an absolute contract to erect a ventilating system was putting the invention "on sale";

but that was reversed (195 Fed. 498, 115 C. C. A. 408), and is not an authority. Judge Denison went so far in the other direction, in Mershon v. Bay City (C. C.) 189 Fed. 741, as to say that an actual sale was not enough, when the buyer had the right to reject, provided that the period for rejection had not passed before the two-year period came into effect. I do not think it necessary to decide the question whether it puts the invention "on sale," if the inventor makes his first contract to sell the article as fully described therein, or by a sample submitted at the time, though the seller does not deliver till within two years. In the case at bar there was no contract of that character; it was a sale by future sample, and, as every one knows, the sample is a part of the contract; it measures the obligations of each, just as though its description were written in with the utmost particularity. The sample, so far as we can see, was not submitted till after September 9, 1907; at least, there is no proof that it was, and nobody was bound to furnish or accept anything till then. Burke could have changed the motor as he liked, Barker need not have accepted any motor at all. If Burke had found something quite different from the invention actually patented, he was as free to submit that as what he then had in mind. Nothing was sold or offered for sale till he was satisfied that he had got what would be successful. How, then, can it be said that he had agreed to sell any of the intermediate forms until the sample was actually sent on? I think the defense fails.

[2] The attack upon the specifications is threefold: That it is deceptive, in saying that the motor will run upon all frequencies of alternating current; that it is too vague to be followed, having no definite quantitative directions, and leaving the public to experiment; that the claims are in form functional, and in effect only for a new use of Latour's motor. I think that the first criticism is true, and that the language of the patent is broader than the facts warrant as now disclosed. Thus (page 1, lines 68–70) the patentee says that his results "are substantially independent of the number of cycles the single phase alternation current." Again (page 3, lines 68–70): "The speed and the efficiency is also substantially independent of the frequency of the alternating current." These statements, together with others, less explicit, indicating the same thing, are true only within certain limits. The commercial motors actually made will run successfully on alternating current up to 60 cycles, but not with satisfaction at 125 or 133. Indeed, it is the defendant's assertion that no practicable motor has yet been devised to run upon such frequencies and also on direct current. Still I cannot think that this has any effect upon the validity of the patent. There is no evidence that it was deliberately introduced to deceive the public, and, so far as appears, it was an honest mistake. It does not concern the construction of the motor, but of the results to be obtained.

The next criticism is that the patent has not enough directions for practical use, and the objection comes down to the proportion between rotor and stator turns and to the angle of the brush position. In direct current motors the stator field is always stronger than the rotor; in alternating current motors the opposite is true. Burke wished to put his motor, which was to operate upon both currents, among the alternating current class. Naturally, he did not mean to limit himself to any exact proportion, but he did indicate a normal proportion, two to one, which gave an index of what he understood. I think that his reference was clear enough to an art which already knew weak stator fields. His description of any element of his combination might be of such latitude as the practice of the art admitted for that element, always assuming that the new result to be obtained did not require more definite limitation. If the defendant hoped to succeed with such a defense, it should have shown that a successful universal motor depended upon a certain definite proportion of turns. Were that so, then the description would be insufficient, but it has not been shown to be so. So far as appears, the motor will work successfully if the elements are combined as described, though in size and proportion they stand anywhere within the limits which the art would recognize as included in their mention by name. When that is so, it is enough only to mention them by name. Particularly, and as regards the proportion of the stator to rotor

turns, so far as appears the implied reference to the alternating current art has not been shown to be inoperative.

As regards the brush position the defendant's case is even weaker. The exact angle of the brushes could not be predetermined, because it varies with the general structure and relation of the parts. To give any angle would have been a miscue; the angle must be found experimentally when the rest of the motor is designed. That experiment is, however, not the kind which requires any independent invention by one who would follow the patent, and which thus leaves the specification imperfect. You need only plot the two curves on the respective currents, and you will always find an area of substantial coincidence, within which the brushes should be put. Westinghouse Electric Mfg. Co. v. Montgomery Electric Light Co., 153 Fed. 890, 82 C. C. A. 636. It is as if a chemist were directed to add enough of an element to secure precipitation. Such a recipe would be an absolutely accurate guide to the result though the quantity varied with temperature or atmospheric humidity. What men need is a path to the goal; they will not be curious of the country it traverses.

The last objection is that the claims are functional. I can really see nothing in this exception that the second, third, and fifth claims conclude with the phrase, "whereby approximately the same speed and torque are maintained under either current," or its equivalent. Nothing is gained or lost by these words; if they are surplusage, they are at least harmless surplusage, adding no element to the claim, which is just as good without as with them. Finally, the assertion that the patent is for a new use is surely untrue. It is one question whether there is any invention over Latour, and another whether the patent is for a new use of Latour. Assuming for the time being that Latour showed the brush position, and that Burke's invention was only a species of the genus Latour, it was a definite enough species, and its differentia, whether good or not in point of invention, consist in the addition of specific new structural elements. Every patent for an improvement forbids the world to use that exact species of a genus which is otherwise free; that form becomes monopolized even as against the very inventor of the genus. While it is true that an inventor is entitled to all the uses of his invention, it is a mistake to suppose that he is entitled to every structural form it may take, regardless of any new invention necessarily imposed upon his own work to produce it. Indeed, were there no structural differentia to serve in this case, it might perhaps be urged that the particular brush position obtained by Burke's method could be said to be a species of Latour which he might not use. While he is entitled to all brush positions of his patent, and while his brushes might by accident be placed at the point predetermined under Burke's patent, at least there could be a process patent in finding the position as Burke points out. Whether there could be a structural patent merely for a given brush position may be admitted to be doubtful, but the question is nowhere presented by any of the claims and is moot.

[3] There finally remains the question of invention, upon which concededly the best reference is Latour, which is, therefore, the only one that need be considered. Before taking up Latour, it will be well to consider what was Burke's real invention. In direct current motors the problem of self-induction is substantially nonexistent. That phenomenon appears, it is true, whenever an electric circuit becomes charged with a current of electricity, but it exists only while the potential rises from zero to its maximum or when it falls again to zero. The period when this occurs with a direct current is so small that it can be disregarded for all practical purposes, for self-induction is a function of the change in potential, and there is no such change in a direct current. This is not wholly a correct statement in a series motor of the type here in question. The rotor is made up of a number of coils of wire, each surrounding a core of iron and terminating at adjacent bars of the commutator. The current is fed to these coils through brushes touching the commutator bars, and the coils are so wound that, if the current come to one end of one coil, one-half of it will pass, not only through that coil, but through one-half the whole number of coils on the rotor, and will be taken off at the opposite brush. The other half of the coils will take the other half of the current from

the brush in exactly the same way; thus the rotor is made into a magnet with a pole at each brush, the current being split in half and going in opposite directions around the two sides of the rotor.

Since, however, the brush is rigid and the rotor moves, each coil must at some time pass under the brush, and from being a coil which takes current around one side of the rotor must become one of those which takes it around the other. This involves a change of direction of the current in that coil, and a subsidence of the potential from its maximum to zero and from zero to its maximum again, though of opposite sign. In this process is precisely illustrated in small proportion the phenomenon of self-induction which the whole system illustrates when excited by an alternating current. Unless the brush is so narrow as not to span the interval between two bars, there must therefore be a moment when one of the coils is short-circuited, else the current in the whole rotor would be broken. As the current dies out in this short-circuited coil, there is established a counter pressure of self-induction, which causes a spark at the time the brush leaves one commutator bar. Thus, even in a direct current commutator motor, we have the problem of sparking, a phenomenon, it is true, of self-induction, but nevertheless quite different in scale from the phenomenon of the general self-induction of the whole system when excited by an alternating current.

Sparking, if uncorrected, causes serious damage to the motor; hence it had long been customary to correct it in direct current motors by a displacement of the brushes. Were it not for this phenomenon, the most efficient work would be done by a direct current motor, if the brushes were placed at right angles with the stator flux. This is true, because at that point the two fields are normal to each other, and the mechanical advantage of the magnetic attraction and repulsion of the poles is at a maximum. This is, moreover, called the neutral position of the brushes, since the brushes are in the neutral plane of the stator flux. Generally in such motors the core of the stator does not completely surround the rotor and the poles are not gradually worked up to a point of highest magnetic activity; the coils come and go abruptly into and out of the stator flux of uniform strength, itself much stronger than the rotor flux. Now, the custom was to bring the brushes within the edge of this strong rotor flux, and by so doing to counteract and destroy the self-induction of the short-circuited coil, produced in the way I have described. This displacement of the brushes was therefore known in the direct current motor art, but it was solely to correct sparking, and it always involved only slight angles of displacement, since the stator fluxes were always strong.

Furthermore, it was also known that a continued displacement of the brushes affected the speed of the rotor, not, as one might expect, to increase it, but the reverse. This increase was, however, at the expense of the total efficiency of the motor, since, the angle of the two fluxes being changed, they operate at less mechanical advantage; part of the stator flux, indeed, being neutralized in its action by another part, as may be seen by plotting them out in diagram. Hence it was at a loss of energy that the added speed was acquired.

Such was the knowledge respecting the direct current motor. The alternating current motor presented a different problem, because of the self-induction of the whole system. When the alternations of current are as high as even 25 to the second, the self-induction arising in the system will make the actual potential lag behind or out of phase with the impressed potential so much as greatly to injure the efficiency of the motor; hence it became of cardinal consequence to overcome the self-induction of the whole system. This had nothing to do with sparking, which was a wholly independent phenomenon requiring separate consideration. It was generally effected by using what are called compensating coils, either in series or shunt, so arranged that, when excited, they would create a flux, opposite in direction to the self-induced flux of the system, and so allowing the potential of the system to operate unimpeded.

Latour was the first, so far as appears in this record, to devise another means by which a part of the stator coils themselves were set to oppose the self-induction of the rotor itself and to act as compensation. As I have al-

ready noticed, any displacement of the brushes from an angle of 90° to the stator flux will affect the mechanical operation of the motor. Parts of both motor and stator will then produce torque in opposite directions; the effective circumference of each for torque will be diminished by four times the angle of displacement. This would be all lost, as it is in the case of direct current, were it not for the fact that when the fluxes meet at an angle a certain component of the stator flux will oppose the self-induced flux of the rotor, thus allowing the flux itself to operate unimpeded. While, therefore, the proportion of the two fluxes which remain in operative mechanical position is less, that part which is thrown out of operation does not remain indifferent to the total effect, but contributes by neutralizing the self-induction of the rotor. There is an equation of gain and loss between these two quantities which differs for every angle of the brushes. No one can say in advance just where the resulting energy will be greatest.

This was Latour's patent, but the defendant insists that his disclosure before the International Electrical Congress showed a nearer approach to Burke. That was a short paper, quite unintelligible to a layman, dealing with alternating current machines having commutators. The sixth and last of these was a single-phase series motor with "perfect" commutation, in which, as the title implies, he seems to be concerned with the commutation only. His suggestion is that the best commutation point for the brushes will be found to be where the resultant field of the two fluxes is normal to the line through the brushes. If the self-induction of the whole system is low, then he thinks the power factor will be pretty high, which may mean—especially if we read the paper with his patent in mind—that the stator coils, which act as compensation, will be enough to counteract a good deal of the self-induction. The most that can be gathered from this I believe is that if you get a theoretically good commutation point, based upon the assumption that you operate by direct current, you may use it as a commutation point for alternating current, and if you have correctly built your system you will also have a good power factor. That Latour supposed the same commutation point would serve for both currents I agree, but he was not thinking about the way to produce power factor at all, and the injection of that element as part of the disclosure seems to me gratuitous. What he meant was that, if the general design was good, the point where the line of the brushes was normal to the two fluxes would also be the point of highest power factor on alternating current. That he did not mean a motor like Burke's is shown by the fact that he necessarily presupposed a stronger stator than rotor flux, which is, indeed, a condition of operability if the brushes are to be set normal to the resultant.

If we assume, as perhaps we should, that he had his patent also in mind, and that he thought it insured a system of low induction, still in combination they show nothing more than that with his St. Louis disclosure you could find a perfect commutation, and with his patent you could get a pretty high power factor. That that power factor insured a coincidence of speed is a gratuitous assumption—first, because we cannot know that the power factor could in fact be made to approach unity; second, because we do not know that power factor alone determines speed. We do not know that Burke reached his result by an opposite path to Latour, even when all these assumptions are made. He did not keep a strong stator flux, nor did he fix his brushes as Latour recommends. He did so design a motor as to secure that coincidence, which Latour does not even suggest, and, if he had suggested, did not achieve.

The French paper contributes nothing more, except the statement regarding the relation of stator to rotor turns. Earlier in the same paper Latour has used his old diagrams, which presuppose a stronger stator flux without which the motor could not operate if the brushes were set normal to the resultant flux. I must confess that I have not been able to understand quite how Vreeland supposed the situation as shown in Figure 8 of the St. Louis article to be changed when the motor was in action, so that it might still remain true of a weak stator field. However, he was right to seize upon the statement in the French paper to support his position, coupled as it was with exactly the same figure as that of the St. Louis paper. Just what was the meaning of the language I am afraid I cannot learn, but it seems to me to refer to the possibility of greatly increasing the rotor turns when the motor is to operate

at high speeds. Such high speeds will be secured when, as in Latour's motor, the brushes are set where the full mechanical effect of the fluxes is not felt. Latour had just been saying that at high speeds there was not time for the establishment of induction in the short-circuited coils. I think he meant that you could therefore afford to increase the rotor flux and still keep your commutation good; but he does not say, and I do not know, why there should be a positive advantage in doing this. In any case the reference seems to me too obscure as a guide to the art, so far as I can accomplish the extremely difficult feat of putting myself in the position of one ordinarily skilled in the art.

I can, therefore, regard Latour as doing no more than showing how part of the stator coils could be used for compensation. He had no idea of a motor which would operate upon either current at a brush position where the speed would be the same for each. The defendant leaps this gap by saying that the step was obvious. Its argument is as follows: Under direct current, for every position of the brush in a given system, there is a characteristic speed, given the voltage; this speed is dependent upon the amount of the field operative at that angle. If the motor be driven by alternating current, for any supposed angle of the brush it would attain the same speed as under direct current, but for the self-induction of the system. The less the self-induction at a given angle, the nearer the two speeds will be at that angle; therefore it requires no invention, nor anything but common sense, to see that, if the self-induction can be neutralized at a given angle, the speeds will be the same. Hence, as soon as Latour showed how the power factor could be raised by brush shifting, he left nothing more for the art to do to get a universal motor.

Upon the assumption that the only element controlling speed was power factor, there is some force in this argument so far as it concerns the single element in the patent of securing the unity of speed. There are, however, a good many reasons to suppose that power factor is not the only element controlling speed. Burke is decided to the contrary; he frankly concedes that he does not understand all that does control speed, and says that he worked it out empirically. Vreeland was least satisfactory upon that branch of the case, and I conclude that his opinion was based more upon a priori reasoning than upon observation in a field with which he was confessedly not so familiar as in other branches of the art. Whether there be any "transformer action" which is independent of the self-induction of the system, whether the whole thing is as simple as Vreeland thinks, must remain to me a doubtful question. I must take it against the defendant.

Moreover there are some other considerations which militate against such an easy explanation. In the first place, every one agrees that the power factor never does reach unity; if so, the curves should never meet, to say nothing of crossing. Yet we find that they do meet and cross, and have areas where the direct current speed is less than alternating. Something certainly has intervened in such a case. Again, if the matter be so easy, why does the defendant assert that no one has ever succeeded in solving the problem for high frequency currents? Upon them there must be some point where the power factor is highest and where the speeds coincide. Burke thinks he can build such a motor, but the defendant does not.

Finally, though it be granted that power factor is all, how was it to be known that it could be brought so near unity as to give a practical coincidence? That certainly could not be ascertained a priori, nor did it arrive until the general designing of the motor had been again and again modified, if Burke is to be believed. No one has said that it will be bound to happen in every kind of motor, no matter what its design, and it is an assumption entirely unsupported by proof that the necessary designing was an obvious thing, open to every skilled artisan. Again, the commutation position is not a priori the same as the speed position, and how the two are to be made to coincide after the speeds have coincided is not shown to be obvious. I shall take Burke's explanation as he gives it: That he reached his result by more or less chance experiment, trying out a number of possible alternatives, guided partly by hypothesis, partly by past experiment, without any authoritative and complete understanding of how he was to reach what he wanted.

But the defendant says that Ells had no trouble in making such a motor

without knowing Burke's brush position. It is true that Ells so testified, but it is also true that, before making the infringing motor, he had had submitted to him the stator and rotor of Burke's very motor itself. In spite of his present insistence that it was left for only a short while with him, the slavish imitation of every detail leaves no doubt that the short time was ample enough to give Ells the key to the structure. It may well be that the brush position Ells borrowed from Latour's paper which he had heard: but it cannot be too often repeated that the defendant's insistence upon brush position as the sole significance of this patent is quite mistaken. I can well believe that, upon seeing the rotor and stator, it was obvious to any one skilled in the art that, to obtain the necessary compensation upon alternating current, the brushes must be shifted. I decline to believe that Ells, unassisted, learned that in that machine there would necessarily be a single position of the same speed upon either current; if he did, I believe it was after the event.

The supposed prior uses of the Standard Electric Works and of Birtman need not occupy much time. Beach clearly did not know anything about brush position, and could not have told whether the brushes were back or forward of the neutral, because he did not know what the neutral was. His tests of speed were only by ear, and amounted to nothing. Lum says that the stator windings were substantially in excess of the rotor, and that the brushes were in conventional position for a direct current series motor. He does not pretend to have measured the speeds on each current, or even to know what they actually were. Radtke's tests are at least open to grave doubt; but, if they were not, they would not prove that Beach had built a motor which would run with equal speeds except either free or with a very small load. When the load became 10 or 15 grams, the divergence was very marked. It does not appear, so far as I have found, that these are overloads. The test for 5 grams is very doubtful, owing to Radtke's change in his tables, upon the supposition that "he must have" used both kinds of current. Perhaps that is true, but his testimony has small probative force.

It is clear enough that we know too little about Beach's motor to regard it as the least of an anticipation. On the contrary, we know it had none of the features described in the claims—neither poles, nor brush position, nor neutral teeth, nor relative windings, nor incommensurate relation. Why it should be thought relevant, except for the unsupported claim that it was a universal motor, I confess I cannot see.

Birtman's motor has even less bearing on the case, if possible, and is put forward with less confidence. There was no effort to show that the brush position had been discovered, or that any of the other features were known except the relative number of windings. To these English did testify, but his testimony is far from satisfying the rigorous tests applicable, and it is pretty evident that his memory, unsupported by any document, was of the haziest kind. Birtman's testimony regarding the relation between the windings does not seem intelligible to me in any way; I can hardly believe that he had any recollection of the matter.

It is of small consequence whether Birtman's motor operated at the same speeds on alternating and direct currents, though I do not think that there is any valid testimony to that effect. The claims in suit are very narrow, and if as good results can be obtained by using Birtman's or Beach's motor, they are open to the defendant. The evidence of Durand and Drake satisfies me that a substantial demand can and did exist, both here and in Europe, for a universal motor, and that no one knew anything to fill it. Neither of these supposed anticipations seemed to answer; but, if they do, they are still open. It is not necessary to decide that this is a pioneer patent, or to trouble about construction of the claims. The defendant must stand nakedly upon the proposition that Burke's combination limited to the precise disclosure is a mere bit of ordinary craftsmanship. That really seems to me too obviously unreal a position to justify so long an opinion, had it not been for the elaborate attack made upon it. If this combination, reached after a series of patient and tentative experiments by an acknowledged expert of ability and ingenuity, is a part of the common heritage of the ordinary routineer, I can only say that I have been wholly blind to the proof.

The usual decree will pass, with costs.

John Robert Taylor, of New York City (Dyer & Taylor and J. E. Bull, all of New York City) for appellant.

C. V. Edwards and Lawrence K. Sager, both of New York City (Edwards, Sager, & Wooster, of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

PER CURIAM. Decree affirmed on the opinion of Judge Learned Hand.

Judge LACOMBE heard the argument, participated in the consultation, and concurred in the above.

---

SHERIDAN-CLAYTON PAPER CO. v. UNITED STATES ENVELOPE CO.

ST. JOSEPH PAPER CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1916.)

Nos. 4364, 4365.

1. PATENTS ☞256—SALE OF PATENTED ARTICLES—RESTRICTIONS.

A purchaser of a patented machine must have notice that he buys with only a qualified right of use, having the right to assume, in the absence of knowledge, that the seller passes an unconditional title to the machine, with no limitations upon the use, and when a machine is sold without restrictions, though contrary to the seller's direction, the purchaser takes it free from restrictions.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ☞256.]

2. PATENTS ☞301(1)—INJUNCTION—SUBJECTS OF RELIEF.

Many of complainant's devices for holding paper were sold free from patent restrictions, or were freed from restrictions because the purchasers were not notified. Defendant sold paper for use in such fixtures, and only in three instances was there an infringement of complainant's patent rights; it appearing that defendants made an effort not to infringe. Held that, where one of the sales which infringed was induced by complainant's own officers, defendants should not be enjoined; the injurious effect of the sales having long since passed, and the torts not being continuing.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 489, 493; Dec. Dig. ☞301(1).]

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Suits by the United States Envelope Company against the Sheridan-Clayton Paper Company and against the St. Joseph Paper Company. From orders issuing injunctions against defendants, they appeal. Order reversed.

Edwin J. Prindle, of New York City (Warren H. Small, of New York City, and Graham & Silverman, of St. Joseph, Mo., on the brief), for appellants.

Louis W. Southgate, of New York City (O. Ellery Edwards, Jr., of New York City, and George Y. Thorpe, of Kansas City, Mo., on the brief), for appellee.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes