Thomas W. NICHOLSON, Appellant,

v.

CARL W. MULLIS ENGINEERING AND
MANUFACTURING COMPANY,
Inc., Appellee.

No. 8639.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 5, 1962.

Decided March 6, 1963.

Robert W. Beach, Seattle, Wash. (J. Wright Horton, Greenville, S. C., on brief) for appellant.

Jennings Bailey, Jr., Washington, D. C. (Richard E. Richards, Lancaster, S. C., on brief) for appellee.

Before BOREMAN and BRYAN, Circuit Judges, and BUTZNER, District Judge.

ALBERT V. BRYAN, Circuit Judge.

Log barking machines are the subject of the three patents now before us in the review of the District Court's determination: (1) that the two owned by plaintiff-appellant Nicholson are invalid, (2) that the one belonging to defendant-appellees Mullis is valid, and (3) that the latter has been infringed by an unpatented machine of the appellant. We sustain the District Judge in rejecting Nicholson's two patents, but we cannot join in his accordance of validity to Mullis'. Thus infringement is not reached.

The issues were made by the suit of Thomas W. Nicholson against Carl W. Mullis Engineering and Manufacturing Company, Inc., for infringement of patents 2,802,495 and 2,802,496 (known as 495 and 496). Carl W. Mullis, president of the Company, intervened to counterclaim with it (licensee) for infringement of his patent, 2,908,302, by an unpatented Nicholson product known as the Accumat.

Nicholson 495 and Mullis are aptly described in the opinion of the District Judge:

"The machines * * * are what are known as ring-type debarkers. Such machines have a ring driven to rotate about a horizontal axis, and logs are fed endwise through the ring and are held against turning by feed rollers. Inside the ring are mounted tools which are pressed against the log and, as the ring turns, remove the bark from the log * * *".

Nicholson 496, on the other hand, is of a different design. There the barking instrument does not circumvolve the log, but rather the log is rotated while a scraper is held against it. Each of these machines, admittedly, is a combination of old elements with inventiveness asserted in its improvement. The only claims in suit are No. 4 in 495, No. 1 in 496 and No. 8 in Mullis, but none can succeed for varying reasons.

I. Nicholson 495 need not be described with greater particularity than the District Judge has done, for we invalidate the claim not upon the design or operation of the machine, but because

its patentability was precluded by a disclosure antedating the protected period. Title 35 United States Code § 102(b) stipulates:

"A person shall be entitled to a patent unless—

"(a) * * *

"(b) The invention was * * * described in a printed publication in this * * * country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *".

Letters patent of 495 were applied for on February 1, 1954; the critical date thus is February 1, 1953, one year prior to the application.

In November 1951 Nicholson negotiated with the Cascade Lumber Company in Yakima, Washington for the construction of this barker. An agreement resulted by which Nicholson would build it at his plant in Seattle and sell it to Cascade for $30,000, the machine to be ready for testing within 150 days from November 26, 1951. Payment was to be made in installments, the final upon acceptance of the machine. If it proved unfit for the intended use and was rejected by Cascade, Nicholson would bear $5,000 of the actual construction cost and Cascade the balance, the machine then to be owned by the parties jointly.

June 13, 1952 Cascade made a progress payment of $7,500. The letter of transmittal recited the understanding that Nicholson expected to have tests of the barker made within the next 10 days and, further, that Cascade had arranged to provide a few logs for the purpose. Nicholson testified the machine was first in condition for operation in August 1952.

In September 1952, at Nicholson's instance, the barker was advertised for sale in a trade publication, The Lumberman, with a photograph and a description of the machine implying it was then operational and available. The same edition carried as a news item a full account—with pictures—of the device. On September 3, 1952 Nicholson wrote another lumber company that the barker would be installed in Cascade's mill by the end of December 1952. He noted that extensive tests had been run on all types of logs and it had done a "wonderful job".

On September 23, 1952 he demonstrated the machine to some 50 people, free of injunction of secrecy. In a letter dated September 27, 1952 Nicholson stated to a prospective customer that the first machine would be installed and in running order by the first of 1953, adding that delivery on a machine required 90 days. The latter representation he testified was in error, for delivery would have required at least 6 months. The original barker was shipped from Nicholson to Cascade in November or December 1952. In November 1952 another illustrated advertisement was placed by Nicholson in The Lumberman for sale of the machine.

He received a firm order for his barker from another concern on December 23, 1952, with a $20,000 down payment on January 23, 1953. By letter of February 1, 1953 Nicholson said he *had* sold other machines through shop exhibits and tests. At trial he explained that these were not actually sales but simply verbal understandings. He also testified the machine did not go into operation at Cascade's mill until after February 1, 1953, saying that 30 to 60 days' actual operation was necessary before the machine could be considered proved. The final payment by Cascade was made on April 17, 1953.

The record discloses that under Rule 131 of the Patent Office an affidavit was filed by Nicholson to the effect that the machine was built and used successfully in the United States prior to October 31, 1952. The purpose of the rule is to fix a completion date of the device to be patented in order to ascertain if it has been preceded by another domestic or foreign patent. Nicholson testified he did not know of this implication.

These unquestioned facts, in the opinion of the District Judge, con-

stituted a public use and sale of the Nicholson machine prior to one year before the patent application. Either of these circumstances would invalidate the patent. We concur in his judgment that both obtain here.

■■ Tests and experimentation are not disclosures within the meaning of the statute. Long Mfg. Co. v. Holliday, 246 F.2d 95 (4 Cir., 1957), cert. denied, 355 U.S. 926, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958). Nor do they prove a "public use". Elizabeth v. Pavement Co., 97 U.S. 126, 134, 24 L.Ed. 1000 (1877). But the incidents just related prove to be far more than tests and experimentation. These had been completed as early as the fall of 1952, the machine doing a "wonderful job". So successful indeed had it been that the lumber industry was publicly solicited to buy in September and November, 1952. Furthermore, the exhibition of the machine on September 23, 1952 had been unconcealed. The audience of about 50 consisted of persons having an interest in barking machines. The occasion was a step in the commercial advancement of the device, not mere experimentation or test. Egbert v. Lippmann, 104 U.S. 333, 336, 26 L.Ed. 755 (1881). These events, certainly in the aggregate, manifest a "public" use within the intendment of the statute. As was said in Egbert v. Lippmann, where the use is "without limitation or restriction, or injunction of secrecy * * * such use is public, even though the use and knowledge of the use may be confined to one person".

■ Again, the machine was certainly put on sale before February 1, 1953. In this we do not overlook those authorities holding that "sale" means not simply a contract of sale but a delivery and acceptance of the article if it is one to be thereafter constructed. B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95, 97 (1 Cir., 1941), cert. denied, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1219 (1942); McCreery Engineering Co. v. Massachusetts Fan Co., 195 F. 498, 503 (C.C.A. 1, 1912); F. E. Myers & Bro. Co.

v. Goulds Pumps, 91 F.Supp. 475, 497 (W.D.N.Y.1950). But see, Henry v. The Francestown Soap-Stone Co., 2 F. 78, 80 (D.N.H.1880). However, as we have seen, instantly there were advertisements and numerous sales before the crucial date, and, notwithstanding each unit had to be made and assembled, "the invention had been reduced to practice" and "proven to have been * * * completed" several months before the sales. Moreover, the original barker was actually shipped to Cascade in November or December, 1952. Further, a substantial down payment—$20,000—had been made January 23, 1953 on the order placed December 23, 1952 and the order was described as "firm". Finally, Nicholson admitted that he had by February 1, 1953 sold other machines. None of the sales other than Cascade's was shown to be conditional. In our judgment the multiple dispositions in the circumstances prove quite clearly and convincingly that the machine was the subject of "sale" before February 1, 1953.

■ But the paramount factor in our determinations—and regardless of where the burden lies in respect to the invocation of the statute, Aerovox Corp. v. Polymet Mfg. Corp., 67 F.2d 860 (2 Cir., 1933)—is the affidavit made by Nicholson before the Patent Office under Rule 131. There he avowed that the machine was "built and used for successfully removing bark from logs" in the United States prior to October 31, 1952. This affidavit was essential to Nicholson, for without it he could not have obtained his patent. We cannot accept his explanation that he was not aware of the effect of the affidavit. Certainly his counsel was so advised and this knowledge must be imputed to Nicholson. The affidavit establishes the completion date of the machine. This uncontrovertible date, when considered with the public exhibition, the advertisements of sale and the sales, all before February 1, 1953 affirmatively prove, as the District Judge held, that the machine was disclosed to the public well before the period protected by the statute.

II. The Mullis Machine, Nicholson insists, infringes his 496 barker's first claim, particularly in respect to the cutting tool. That claim is:

"1. A log-barking machine comprising log-supporting means, a scraper blade having a substantially angular log-engaging edge formed by the convergence of two substantially planar surfaces toward such edge and elongated lengthwise of a log supported by said log-supporting means, said log-engaging blade edge being straight substantially throughout its length, means operable to effect relative movement between said blade and such log in a direction circumferentially of such log with said log-engaging edge of said blade engaged therewith to scrape bark therefrom, and means supporting said scraper blade with one of such substantially planar converging surfaces forming the leading surface of said scraper blade and disposed generally parallel to the longitudinal axis of such log, but with the angle, between such leading surface of said scraper blade and a tangential plane which is perpendicular to a diametric plane of such log extending to said log-engaging edge, being at least as small as a right angle."

■ This patent was applied for August 27, 1954 and issued August 13, 1957, while the Mullis patent was filed July 15, 1957 and issued October 13, 1959. The District Court found that Nicholson's 496 Claim 1, which alone is sought to be vindicated in this suit, was anticipated by the Stoltz German patent, 522,701, issued April 13, 1931. It is clear 496 cannot stand as against Stoltz.

Claim 1 of Stoltz reads:

"1. A debarking machine comprizing a cutter mounted on a swinging arm under the pressure of a spring and oscillating around a shaft parallel to the axis of rotation of the trunk, characterized in that a tracer or protective arm is provided in front of the cutter in the direction of rotation, said tracer or protective arm being fixedly connected to the cutter holder and extending far enough to absorb shocks or impacts caused by protruding portions of the tree trunk being debarked and therefore lifting the cutter holder from its position of work in the direction of rotation."

This claim itself demonstrates the kinship of 496 and Stoltz. The principle of operation of the two is almost identical. Nicholson does not have the Stoltz tracer —a protective arm—in front of the cutter but this difference does not distinguish the two.

In layman's language each of them may be described in this way: By appropriate supporting means a log is held in a horizontal position and rotated. Against it is placed a scraper blade or tool which engages the log. The scraper blade or tool is held by an arm, pivoted at the bottom, inclined towards the log and the tool applied to the log by the force, on the arm, of a spring (in Stoltz) or by attachment to a piston working out of a cylinder containing fluid pressure (in Nicholson 496). The cutting tool or blade consists of the edge of a metal plate. The difference between the blades or tools in the Nicholson and Stoltz devices in our opinion is not material.

As we join the District Court in the view that Claim 1 of Nicholson 496 is invalid as anticipated by Stoltz, of course there is no infringement of 496 by Mullis.

■ III. The Mullis patent is No. 2,908,302, applied for on July 15, 1957 and issued October 13, 1959. The District Judge concluded that "[t]his combination was new and I find the Mullis patent valid." His conclusion was not evolved from conflicting testimony but rather upon a comparative reading of the patents. Inasmuch as these documents are equally as available to us, the resolution of the question of patent validity by the trial court is not as binding here as would be a factual ascertainment upon varying evidence under Rule 52(a) F.R.Civ.P., Kiwi Coders Corp. v. Acro Tool & Die Works, 250 F.2d 562 (7 Cir.,

1957). Our examination convinces us that Brundell's patent, No. 2,786,499, filed March 22, 1954, issued March 26, 1957 clearly anticipated Mullis.

No. 8 is the only claim of the Mullis patent in question. The best description of that machine is written in the claim:

"8. In a log-skinning machine, a rotary reel assembly having a central passage for the axial movement of logs therethrough, a plurality of askew-shaped arms pivotally mounted on said reel for movement towards the center of said passage, bark-removing elements mounted on the inner ends of said arms, an annular tank containing a fluid under pressure surrounding said reel and carried thereby, fluid pressure operated means mounted on the inner peripheral wall of said tank in communication with the interior of said tank, said means having connection with said arms to exert a constant pressure on the arms, and means for rotating said reel."

It must be remembered, as the District Judge stated in his conclusions, that the ring type of barker did not originate with Mullis. It is found, among others, in: Brundell; Emery, 2,477,922, August 2, 1949; Whitlock, 2,591,751, April 8, 1952; as well as Nicholson 495, already discussed. These have various means of exerting force upon the tool arm, including hydraulic and pneumatic actuation. Indeed, Nicholson 495 used air pressure in independent and isolated cylinders.

The inventiveness asserted by Mullis, and found by the Court, was pointedly noted in the District Judge's opinion as follows:

"Mullis devised a machine which incorporated a number of features which Nicholson's own expert admitted he had never seen before in combination. *It has a source of pressure fluid carried by the ring, so that no outside supply is needed,* and there are *no sealing joints required* between the ring and the stationary part of the machine. *The source is connected to all the cylinders so that the pressure is equalized on all the tool-carrying arms. The arms are 'askew',* that is, they have curved front edges so that, when the butt end of a log strikes them, *they open automatically* and apply the tool to the log. [Emphasis added]

"No patent in the prior art and no machine known to plaintiff or his expert, has a self-contained reservoir of pressure fluid in the ring connected to all the cylinders with self-opening askew arms  *  *  * "

Finding No. 52 of the District Judge had already well detailed the first of the two advantages in this way:

"A valve allows the operator, while the machine is stationary, to supply compressed air to the inside of the hollow ring. This causes a pressure on the pistons which pushes them against the log as it passes through the ring."

This initial aspect of inventiveness— the annular tank containing fluid under pressure by air or gas inserted into the tank before commencement of its operation, and dispensing with connections between the ring and the stationary part of the machine to obtain air or gas—is not novel. Equalization of the pressure on the several arms by a common, or interconnected, source of pressure is found in Brundell, 2,786,499. At the same time, Brundell specified the introduction of the pressure fluid at a single point in the ring and no constant supply was needed from the outside during operation. Column 3, lines 54–65 give this description of these two elements:

"It is believed clear that liquid can be forced into the *hydraulic system by hand pump,* not shown, adapted for coupling with the conduit. Inasmuch as the liquid circuit is in communication with all of the piston cylinders, introducing the liquid under pressure at one point will place the same pressure in each cylinder so that the tension of the rubber bands

will be equal for each tool. Any differences between the rubber bands as occasioned by different settings will automatically be compensated for. The pressure gauge will furnish a reading that is proportional to the actuating force of a tool against a log." [Emphasis added]

True, Brundell used rubber bands as a connection to hold the cutting arm and tool in place. But in a modified arrangement for regulating the tension of the bands a piston rod in a cylinder is attached to one end of the bands, and fluid is introduced into the cylinder in front of the piston to control its movement. The fluid for all of the cylinders flows in a common conduit about the ring.

As to the other alleged aspect of novelty—"self-opening askew arms"—the equivalent is found in the specifications of Brundell as follows:

"[T]he swingable arms being of such a shape that when they are contacted by an oncoming log, *they are automatically swung outward* as they ride over the butt end of the log, the tools thus being moved onto the peripheral surface of a log * * *" Column 2, lines 36–40. [Emphasis added]

Finding 60 of the District Court specifically states that Brundell has "self-opening arms".

Thus Claim 8 of Mullis cannot stand. In this only do we disagree with the trial judge's thorough analysis of the entire case. In reaching the decision to invalidate Nicholson 495, Nicholson 496, and Mullis we are not unaware of the presumptive validity of a patent by virtue of 35 U.S.C. § 282, but we think the prior public disclosure of 495 and the preconception of 496 and Mullis in earlier patents have been well and adequately demonstrated.

The decree in review will be affirmed except insofar as it enjoins the manufacture, use or sale of the Accumat or other machines embodying the principles of Claim 8 in Mullis patent No. 2,908,302 and awards an accounting by Nicholson to the defendants Mullis, this part of the decree being reversed. The cause will be remanded for dismissal of both the complaint and the counterclaim. Costs on appeal will be divided equally between the appellant on the one hand and the appellees on the other.

Affirmed in part; reversed in part; and remanded.