The **ROBBINS COMPANY**, Plaintiff-Appellee,

v.

**LAWRENCE MANUFACTURING COMPANY**, Defendant-Appellant.

No. 71-2944.

United States Court of Appeals, Ninth Circuit.

July 24, 1973.

---

John M. Calimafde (argued), Stephen B. Judlowe, of Sandoe, Hopgood & Calimafde, New York City, Bruce M. Pym, of Graham, McCord, Dunn, Moen, Johnston & Rosenquist, Seattle, Wash., for defendant-appellant.

John O. Graybeal (argued), James R. Uhlir, of Graybeal, Barnard, Uhlir & Hughes, Seattle, Wash., for plaintiff-appellee.

Before MERRILL, CARTER and CHOY, Circuit Judges.

### OPINION

JAMES M. CARTER, Circuit Judge:

Appellee The Robbins Company (hereafter Robbins) brought suit against appellant Lawrence Manufacturing Company (hereafter Lawrence), a competitor in the field of tunnel boring machines, for infringement of Robbins' Patent No. 3,216,513. Lawrence moved for summary judgment. This appeal is from an order of the district court *denying* that motion.

Ordinarily such an order would not be a final judgment and, hence, not appealable. However, the trial court granted appellant's petition to certify the question for appeal and a panel of this court, pursuant to 28 U.S.C. § 1292(b), granted appellant's motion to hear the interlocutory appeal.

The sole question on appeal is whether the patented subject matter, rock cutter assemblies, was "on sale" in this country more than a year prior to application for the patent, thereby rendering the patent invalid. We reverse.

The statute involved, 35 U.S.C. § 102(b), reads as follows:

"§ 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

   .     .     .     .     .     .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or *on sale* in this country, more

than one year prior to the date of the application for patent in the United States." [Emphasis added]

No question is presented as to the description of the patent in any printed publication in this country or elsewhere, or as to public use.

### Facts

The patent concerns cutters which are designed for attachment to tunnel boring machines. The boring machine has at its front a rotating headplate to which an array of cutters are attached. The remainder of the machine is a locomotive-like device for driving the front end into the face of the earth while rotating the headplate. The patent does not concern anything but the cutters.

An application for the patent was filed on January 6, 1964, and Patent No. 3,216,513 issued on November 9, 1965. The patent specification refers to an earlier application dated February 18, 1963. Appellant assumes that the patent is entitled to the earlier filing date of February 18, 1963. Thus the patent is invalid under 35 U.S.C. § 102(b) if it was "on sale" more than one year prior to February 18, 1963, that is, prior to February 18, 1962, the critical date.

The prior cutters used slightly different seal and bearing arrangements. The patented version uses inclined, instead of arcuately disposed, roller bearings, and metal-to-metal seals instead of metal-to-rubber or gasket seals. Inclined roller bearings and metal-to-metal seals were, however, merely standard items purchased in the market place.

The appellant relies upon two transactions, claimed to be within the "on sale" prohibition, before the critical date: (1) the Hydro-Electric Commission transaction, and (2) the M. J. Bles Construction Company transaction.

### The Hydro-Electric Commission Transaction

In 1959, the Hydro-Electric Commission of Tasmania, Australia, invited offers from manufacturers who had successfully built tunnel boring machines, for a machine to be custom built to detailed specifications for use in constructing the Great Lake Power Development, near Poatina in northern Tasmania. The terms of the bid made the successful manufacturer responsible for shop testing the boring machine before shipping; placed delivery f. o. b. the shipping port; reserved the right to cancel if the April 1, 1961 delivery date were not met; required a specific boring rate of 40 feet per day; and demanded a guarantee of performance.

In December 1959, Robbins submitted a detailed written offer for sale of such a machine. The Commission accepted. A contract was executed in June 1960, which specifically provided for a list of machine components and a price schedule, and required delivery f. o. b. Seattle, Washington by March 18, 1961. Time was made of the essence, with a penalty for late delivery and a bonus for early delivery.

Robbins guaranteed a tunneling rate of five feet per hour, against a $21,550 penalty for breach thereof. Robbins was to receive 95 percent of the total price, which was $453,705.05, when the goods were delivered in Seattle. The remainder was due after 500 feet of tunneling, or six months after on-site acceptance. There was no mention in the offer of the patented cutter; an earlier version was listed. However, the Commission's design acceptance under the contract, in September 1960, did specify the later-patented D–1053 cutter. Nothing in the contract mentioned experimentation, and the Commission had no obligation to supply test or other data to Robbins.

The assembled machine, with 50 of the D–1053 cutters, was assembled, shop tested, disassembled, packed and then delivered on shipboard in Seattle on January 30, 1961—more than one year prior to the critical date of February 18, 1962. Robbins received 95 percent of the price, in U.S. dollars. The machine was publicized in the newsletter of its fabricator,

Pacific Car & Foundry Company, in February 1961, without reference to experimentation. It arrived in Australia, was assembled and tested under Robbins' supervision, and the Commission certified it acceptable on May 5, 1961. Robbins received the remaining five percent of the purchase price. The machine was then used to bore thousands of feet of tunnel, prior to the critical date.

Thus, well before the critical date Robbins competitively sought and obtained a "time of the essence" contract for 50 cutters, had them manufactured and delivered to it, sold and received payment for them, and the customer received, successfully used, and accepted the equipment.

### The M. J. Bles Construction Company Transaction

In the summer of 1960, the M. J. Bles Construction Company of McLean, Virginia, had obtained a contract from the District of Columbia to build an underground tunnel for a Potomac sewer project. Robbins contacted Bles in July 1961 to persuade Bles to lease or rent Robbins' tunneling equipment for the project. Robbins made a detailed proposal, offering to lease or rent to Bles its Model 71 machine. Bles accepted, and an agreement, lease and option to purchase were executed on November 10, 1961, prior to the critical date of February 18, 1962.[1]

The document provided for use of the machine in tunneling 7,900 feet for the sewer project, with an advance rental of $30,000 plus an amount based on tunneling footage. A minimum royalty of $154,050 was specified for 7,900 feet. Robbins guaranteed a boring rate of at least three feet per hour, within 30 days after the work commenced. Bles was to have exclusive control over the machine, and bear the expense of any necessary technical assistance. The document, at Bles' request, contained an option to purchase the machine, including the cutters, for an additional $175,000.

As with the Commission contract, nowhere was "experimental use" mentioned in the Bles transaction.

Robbins ordered D–1142 cutters, which were within the later patent, from its subcontractor, and the cutters were delivered to Robbins on January 16, 1962, prior to the critical date. Thereafter, in March 1962, the machine and cutters were delivered to Bles. The machine was unsuccessful, for reasons unrelated to the cutters. On June 22, 1962, the lease agreement was terminated, and Bles' advance rental was returned to it.

### Discussion

The fact that this is an appeal from an order denying the motion for summary judgment marks the case as an unusual one. Of course, such orders are interlocutory and not appealable without compliance with 28 U.S.C. § 1292(b). Here an able trial judge acceded to Lawrence's desires and certified the matter under the statute, stating that "the . . . order [denying summary judgment] involves a controlling question of law . . . and that an immediate appeal from this order as authorized by 28 U.S.C. § 1292(b) may materially advance the ultimate termination of this litigation." The Court of Appeals will grant such interlocutory review only in extraordinary cases where decision might avoid protracted and expensive litigation. United States Rub-

---

1. Robbins' brief states that Bles was never advised of the specific nature of the disc cutters to be incorporated in its Model 71 machine prior to its delivery. But the brief also states, "The particular cutter which Robbins had decided to test on the Bles machine was the Model D–1142, which cutter included a bearing and seal configuration similar to the D–1053 cutters as well as a removable cutter ring." Robbins does not contend that the D–1142 cutters were not within the terms of the later patent.

The D–1142 cutters were the ones which were placed on the Bles machine and which were later delivered. The option to purchase thus included the D–1142 cutters.

ber Co. v. Wright (9 Cir. 1966) 359 F.2d 784, 785 (per curiam).

Robbins contends that the use of the patented device in the two transactions set forth above, was an experimental use and thus within an exception to 35 U.S. C. § 102(b), *supra*. The case law makes clear that an experimental use is not within the "public use" provisions of the statute, Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141 (1887); FMC Corp. v. The F. E. Myers & Bro. Co. (6 Cir. 1967) 384 F.2d 4, 9–10, cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), nor is such experimental use within the "on sale" provisions. Watson v. Allen (1958) 103 U.S.App.D.C. 5, 254 F.2d 342, 346 (Burger, Circuit Judge).

There were no provisions in either the Hydro-Electric or the Bles transactions which stated that the sale was for experimentation, or required secrecy in the use of the device or reporting the results of the supposed experimentation.

After Lawrence filed its motion for summary judgment, Robbins for the first time contended that its offers for sale and sales were solely for experimental use. Robbins submitted three affidavits, two by James S. Robbins, its president and the inventor, and one by Sugden, a friend and sales agent for Robbins in Australia and a former employee of the Hydro-Electric Commission. These affidavits contained conclusory characterizations of the cutters as having been supplied in the two transactions for experimental purposes, based on the subjective intent of Robbins and Sugden.[2]

2. Sugden's affidavit states that at the time of the sale, he was the plant engineer of the Hydro-Electric Commission of Tasmania. He was responsible for equipping all tunneling operations for them. In that capacity, he negotiated with Robbins to provide for installation of earlier-type cutters, if the new (and later patented) cutters proved unsatisfactory.

Sugden regarded the new cutters as experimental, to the extent that any equipment not field-tested must be so regarded. All of the new cutters supplied by Robbins were expended in the first 2,000 feet of tunneling, and were not really tested in hard rock. (In about July 1962, after the critical date herein, other, similar cutters furnished by Robbins were tested in hard rock, and found useless.)

Robbins, in his first affidavit, confirmed Sugden's statements in blanket fashion. He added that both Robbins and the Hydro-Electric Commission fully understood that the 50 cutters originally supplied with the machine, which were of the later-patented type, "were experimental and untested." He said that Robbins had no means to evaluate the new design, except to furnish a quantity to its customer to "use and evaluate . . . in the course of its operation of the machine . . . ." The machine was assertedly incomplete and nonoperational prior to assembly and testing in Tasmania. (But the patent concerned cutters, not the machine.)

Both Robbins and Sugden said that the machine was specifically built to accommodate earlier-type cutters, should the new ones prove unsatisfactory.

Robbins' second affidavit largely related to the Bles transaction. Robbins said that the proposal to Bles did not specify any particular cutter, and Robbins did not recall that he or his firm specifically advised Bles about the type of cutter to be furnished. At the time of this proposal, and of the later construction of the Bles machine, there had been no substantial testing of the cutters originally supplied to Tasmania. The affidavit further asserted that Bles desired an option to buy the machine, which option ran out prior to the contractual delivery date, solely in pursuant of a trade practice to take such options as a means of foreclosing the equipment to the use of competitors. If Bles had actually been expected to buy the machine, it would not have included certain experimental features which it in fact incorporated, and which Robbins intended to test and perhaps use in later mining operations. The Bles machine was delivered to the job site on April 11, 1962. It proved unsatisfactory, for reasons unrelated to the cutters, and the agreement was ended by mutual consent on June 22, 1962.

It is evident that nowhere in these three affidavits does it appear that any reports of experimental use were required to be made to Robbins by the users. There were no express provisions nor informal arrangements which would indi-

Even if we were inclined to credit these conclusory and subjective statements, they do not establish that the transactions were *substantially* for purposes of experimentation. *Smith & Griggs Mfg. Co., supra; FMC Corp., supra.*

At best, the import of the affidavits is that fully developed prototypes of the new cutters were sold for commercial exploitation; but because the particular configuration of bearings and seals (the innovations covered in the patent) had not been placed into such use before, Robbins and Sugden, as prudent engineers, considered the new cutters to be experimental. However, similar cutters had previously been successfully used to cut rock, and the innovations in seals and bearings, both obtained from suppliers' stock, were apparently not anticipated to have a fatal effect upon that ultimate function. Indeed, they did not, as seen from the Tasmania experience prior to the critical date herein.

■ An inventor's testimony of his subjective intent has no probative force against overwhelming evidence to the contrary. Super Mold Corp. v. Clapp's Equipment Div., Inc. (9 Cir. 1968) 397 F.2d 932, 935. Such testimony is insufficient to raise a genuine issue of material fact to defeat an adverse summary judgment.

Even considering the alleged experimentation in this case, it does not meet the requirements of the many cases which have dealt with the experimentation defense. Examination of those cases has brought us to another theory which supports our decision, to which we now turn.

■ When a later-patented item is sold prior to the critical date, the passing of title by that sale does not end the inquiry. "A sale which is primarily for the purpose of experiment will not bar patentability." Watson v. Allen, *supra,* 254 F.2d at 346; Austin Machinery Co. v. Buckeye Traction Ditcher Co. (6 Cir. 1926) 13 F.2d 697, 700. Kerner Incinerator Co. v. Townsend Estates, Inc. (N. D.Ohio 1926) 27 F.2d 599, 604, aff'd, 27 F.2d 606 (6 Cir. 1928) (per curiam), cert. den., 279 U.S. 843, 49 S.Ct. 264, 73 L.Ed. 989 (1929), holds there can be an experimental use even though title passed. The patent was accordingly held valid.

■■ Activity not resulting in a sale can constitute an "on sale" defense. " 'On sale' does not mean an actual accomplished sale but activity by the inventor or his company in attempting to sell the patented idea." Amphenol Corp. v. General Time Corp. (7 Cir. 1968) 397 F.2d 431, 433; Kraus v. Emhart Corp. (N.D.Calif.1970) 320 F.Supp. 60, 63. A simple placing on sale is sufficient to establish the "on sale" defense—even an executory contract under which the patented matter is delivered after the critical date. Tucker Aluminum Products, Inc. v. Grossman (9 Cir. 1963) 312 F.2d 293, 295; *see also* Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp. (9 Cir. 1963) 316 F.2d 459, 465, cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143.

The underlying policy appears to be that an *unconditional* placing "on sale" creates an opportunity for public use. " 'The putting "on sale" intended by the statute is more or less analogous to a public use . . . .' " B. F. Sturte-

cate that a substantial purpose of the transactions was the field testing of experimental cutters. Although Robbins' first affidavit states, and Sugden's implies, that the cutters "were experimental and untested," and so understood by all parties, nothing except the sworn subjective statements of Sugden and Robbins indicates that the primary or even a substantial purpose of the transactions was for experimentation with the cutters.

If such had been the purpose, it would certainly be singular for that purpose not to have appeared in any recorded form until after the motion for summary judgment in this litigation, which occurred approximately eight years after the critical date. Moreover, when that purpose did appear, it was attested to in a conclusory and subjective manner, and solely by an interested party, Robbins, and his friend and former sales agent, Sugden.

vant Co. v. Massachusetts Hair & Felt Co. (1 Cir. 1941) 124 F.2d 95, 97 (on denial of rehearing), cert. denied, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1219; Dart Industries, Inc. v. E. I. du Pont de Nemours & Co. (N.D.Ill.1972) 348 F. Supp. 1338, 1358.

However, strictly speaking, the word "public" in the phrase "in public use or on sale" modifies only the word "use." Piet v. United States (S.D.Cal.1959) 176 F.Supp. 576, 584, aff'd, 283 F.2d 693 (9 Cir. 1960); Hobbs v. United States (5 Cir. 1971) 451 F.2d 849, 860.

There are certain categories in which it is clear that the fact of a sale, or an offering for sale, does not eliminate the experimental exception.

(a) *Conditional sales.*

"A sale which reserves to the inventor a right of experimentation and substitution does not place the invention on sale . . . ." 2 Deller's Walker on Patents § 147, at 711 (2d ed. 1964). Austin Machinery Co. v. Buckeye Traction Ditcher Co., *supra*, 13 F.2d at 699–700, is such a case. There was a sale and use, supervised by the inventor as a joint vendee, which was held to be a conditional sale. The lower court's judgment, holding the patent invalid because of sale or use, was reversed. In Ushakoff v. United States (1964), 164 Ct.Cl. 455, 327 F.2d 669, a purchase by the Air Force prior to the critical date, stated the purchase was to be an "experimental procurement" for comparative or service tests, *id.* at 677, and the defense of invalidity of the patent was rejected.

(b) *Sales with no requirements of secrecy or reporting.*

Wilkie v. Manhattan Rubber Mfg. Co. (3 Cir. 1926) 14 F.2d 811, 812, held a patent invalid under both the "public use" and "on sale" defenses to an infringement action. The court said:

"[T]he inference of the inventor's intention, before the grant of the patent, to abandon his invention to the public is established (and the patent subsequently granted is invalid) un-less successfully controverted by full, unequivocal and convincing proof that such use and sale were not of the completed and commercially operative device subsequently patented, or that such use and *sale were not absolute and unconditional* but were principally and primarily for the purpose of perfecting the uncompleted invention by tests and experiments." 14 F.2d at 812. [Emphasis added]

The court noted that although both the inventor and the buyer may have hopefully awaited reports on the success of the invention, there was no showing of actual follow-up by the inventor, nor of conditions on the sale. The court said "there is no indication that the rolls were sold . . . for durability tests or experiments of any kind." The rolls were sold "absolutely and unconditionally . . . ." There was no follow-up by the inventor. *Id.* at 812. "To that extent the use was problematical rather than experimental." *Id.* at 813.

Ajem Laboratories, Inc. v. C. M. Ladd (6 Cir. 1970) 424 F.2d 1124, 1125–1126, 1128, cert. den., 400 U.S. 830, 91 S.Ct. 59, 27 L.Ed.2d 60, held a patent invalid because of prior sales. There were six offers for sale; the sales were solely for profit; none of the machines were offered for sale for experimental purposes; no requirement was imposed that the machines be kept secret or in confidence; there were no requirements that reports be made on their operation. It was held that the trial court was fully justified in rejecting the argument that the machines sold were "experimental" within the rule of *Austin, supra*. The patent was held invalid. There was a sale, not experimentation.

In Cataphote Corp. v. De Soto Chemical Coatings, Inc. (N.D.Cal.1964) 235 F. Supp. 936, aff'd, 356 F.2d 24, 26–27 (9 Cir. 1966), cert. den., 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 there were sales prior to the critical date, with "all the earmarks of ordinary commercial sales without any contemporaneous indication of a limitation that the sales were for

the purpose of further experimentation or testing . . . ." 235 F.Supp. at 938. The trial court found the sales were not experimental and held the patent invalid.

Piet v. United States, *supra*, held a patent invalid because there were no restrictions or conditions on the sale. The court stated, "Restricted or secret sales do not result in 'public use'. This protects the inventor against having a sale for experimental purposes turned by others, without his consent, into a public use." 176 F.Supp. at 582. In affirming, we stated, "Plaintiff-inventor chose . . . [not] to . . . restrict or limit the use of the valves by others. By his own actions he has prevented the protection ordinarily granted by a patent to apply to him . . . ." 283 F.2d at 693.

### (c) *Sales where device not complete*

In Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp. (9 Cir. 1963) 316 F.2d 459, the Ninth Circuit recognized that where no fully operative device is in existence prior to the critical date, a contract to sell the device, prior to that date, is not a placing of the invention on sale under the statute. *Id.* at 464. The court held no contract existed, and there were no special circumstances requiring the court, absent a prototype, to hold that the invention was "on sale." In *B. F. Sturtevant Co., supra*, 124 F.2d at 97, a contract to construct from plans and deliver in the future, a machine not proven to have been previously completed, did not constitute putting the invention "on sale."

Certain other cases, less clear in their application to our problem, are set forth in the margin.[3]

Accordingly, we adopt the following rule to determine whether a sale or offering for sale precludes patentability.

A sale or an offering for sale

precludes any inquiry into the experimental nature of the sale *unless* the contract of sale or the offering for sale contains an express or clearly implied condition that the sale or offering is made primarily for experimental use.

Thus the sale or offering would not ipso facto invalidate the patent nor preclude further inquiry into the experimental nature of the use where the contract or the offer stated that the sale was for experimental purposes (*Austin* and *Ushakoff, supra*); or showed that the device was still experimental and that no workable prototype had been made (*Americo Contact Plate Freezers, supra*); or required that the invention should be kept confidential or from public view, or that reports on the use of the invention should be supplied to the inventor (*Ajem Laboratories, Cataphote,* and *Piet, supra*); or other similar statements appeared from which it could clearly be implied that the sale or the offering was made for an experimental purpose.

In cases where the exceptions did *not* appear in the sale or offering for sale, summary judgment would be permissible and proper. If the excep-

3. Less clear cases relating to the problem are: Hall v. Macneale, 107 U.S. 90, 96–97, 2 S.Ct. 73, 27 L.Ed. 367 (1882) (sale of safes not experimental—arose as an afterthought); Nicholson v. Carl W. Mullis Engrg. & Mfg. Co. (4 Cir. 1962) 315 F.2d 532, 535, cert. den., 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963) (invention reduced to practice and sales not conditional); George R. Churchill Co. v. American Buff Co. (7 Cir. 1966) 365 F.2d 129, 133–134 (distribution to jobbers and sales to customers indicated market acceptance testing, rather than an experimental use; findings of "public use" *and* "on sale" supported); Magee v. Coca-Cola Co. (7 Cir. 1956) 232 F.2d 596, 600 (offer to sell, made after experimental stage, is a placing "on sale"; no evidence of experimentation); Hunt Industries, Inc. v. Fibra Boats, Inc. (S.D. Fla.1969) 299 F.Supp. 1145, 1150 (dicta that facts such as experimental use, which may be fatal to patentability *after* experimentation, are frequently excused if they occur beforehand).

tions did appear, then a trial on the merits could dispose of exceptions made falsely or collusively and, generally, the merits of the claimed exceptions.

Where there has been commercial exploitation, the courts have generally found there was "public use" and not experimental use. Smith & Griggs Mfg. Co. and FMC Corp., *supra*. But even in case of a sale where the real purpose was experimentation, the patent is still valid. Watson v. Nelson, *supra*. Thus obtaining some monetary return from a sale made primarily for experimental purposes may not constitute in every case a "commercial exploitation" which invalidates the patent.

Under this rule, where there was some commercial exploitation, a showing that a sale or offering for sale was conditioned upon experimentation would preclude summary judgment against patentability. The court could then hear proof on the merits and determine whether the case came within the experimental exception.

■ The rule we rely on clarifies the problem for inventors. The sale or offering for sale of a later-patented item places it "on sale," within the statute, *unless* there is the express or clearly implied condition of experimentation.

■ Applying this rule to the facts of this case, it is clear that in both the Hydro-Electric and the Bles transactions there were sales and offerings for sale, with no express or clearly implied condition that they were for an experimental purpose. The device had been completed and was in existence. No requirements of secrecy were imposed on Hydro-Electric or Bles, nor were they required to report on the results of the supposed experimentation. Summary judgment was therefore proper.

Several other contentions deserve brief comment. Robbins argues that the Bles transaction was a rental, and not a placing on sale, because the purchase option was merely a trade practice to prevent Bles' competitors from obtaining the use of the machine. Robbins does not argue that if Bles had exercised the option, Robbins would have refused to sell.

Robbins further argues that the Tasmania sale did not occur in this country, and that therefore the sale was outside the scope of 35 U.S.C. § 102(b), as noted above. We believe the cutters were placed "on sale" in this country, within the meaning of the statute. It is undisputed that Robbins' offer was made here. Although Robbins' offer did not specify the later-patented D–1053 cutters, the Commission's design acceptance under the contract, in September 1960, did so specify them. Whether the sale was completed in the United States or in Tasmania, the D–1053 cutters were "on sale" in the United States in September 1960, long before the critical date of February 18, 1962.

Neither counsel for the parties nor we have found a case passing on the status of goods made in the United States and sold for export trade vis-à-vis the statutory proscription. Gandy v. Main Belting Co., 143 U.S. 587, 12 S.Ct. 598, 36 L.Ed. 272 (1892), and Hunt Industries, Inc. v. Fibra Boats, Inc. (S.D.Fla.1969) 299 F.Supp. 1145, were both cases where the manufacture and sale occurred abroad.

There is dictum in Cataphote Corp. v. De Soto Chemical Coatings, Inc., *supra*, 235 F.Supp. at 940, to the effect that a "foreign 'on sale' transaction does not fall within the provisions of Title 35 Sec. 102 . . . ." [Emphasis added.] However, the matter was not mentioned in the Circuit decision.

■ Whether or not such a sale is consummated in a foreign country, we hold that the product is "on sale" in the United States, within the proscription of the statute, if substantial activity prefatory to a sale occurs in the United States. An offer for sale, made in this country, is sufficient prefatory activity occurring here, to bring the matter within the statute. *See Amphenol*

*Corp., Kraus,* and *Tucker Aluminum Products Co., supra.* Sugden was in Seattle in the summer of 1960 to negotiate the contract with Robbins, and his affidavit detailed his activities. He was also present in Seattle during shop testing, disassembly and packing of the machine. He remained here until the machine was placed aboard ship in Seattle. Robbins then received 95 percent of the purchase price.

The judgment is reversed and the cause is remanded to the district court with directions to enter summary judgment for appellant Lawrence.