Jorgen V. KIERULFF, Plaintiff,

v.

METROPOLITAN STEVEDORE COMPANY, Defendant.

Civ. A. No. 527–60.

United States District Court
S. D. California,
Central Division.

Aug. 23, 1963.

As Amended Sept. 3, 1963.

Ashley Stewart Orr, Pasadena, Cal., for plaintiff.

Whann & McManigal, Los Angeles, Cal., for defendant.

MATHES, District Judge.

This cause having been tried on the 18th, 22nd and 23rd days of August, 1961, and the United States Court of Appeals for the Ninth Circuit having rendered its decision herein on the 26th day of March, 1963, 315 F.2d 839, and the pleadings, proofs and arguments of plaintiff and the defendant made both prior to and following the decision of the United States Court of Appeals for the Ninth Circuit having been duly considered, the Court makes, finds and states its Amended Findings of Fact and Conclusions of Law following Remand by the Court of Appeals, as follows:

FINDINGS OF FACT

*The Action.*

1. This is an action for infringement of claims 1, 2 and 3 of United States Letters Patent No. 2,919,042, for a scrap-loader issued December 29, 1959, to Jorgen V. Kierulff on an application filed October 8, 1956. The patent relates to a device for loading scrap metal into the hold of a ship, entitled "Traveling Ship Loading Crane."

2. Defendant has set up the defenses of invalidity, lack of infringement as to a slightly modified construction of the invention, and implied license.

*Jurisdiction.*

3. The Court has jurisdiction of this cause under Title 28 United States Code §§ 1338(a) and 1400.

*The Parties.*

4. Plaintiff, Jorgen V. Kierulff, is a citizen of the State of California.

5. Defendant, Metropolitan Stevedore Company, is a California corporation, having a regular and established place of business at 211 North Marine Avenue, Wilmington, California.

*The Patented Invention.*

6. The invention as defined by claim 1 of the patent in suit is directed to a scraploader comprising a rectangularly shaped bridge which is placed over the hatch opening during the loading operation. A superstructure comprising substantially a square-shaped frame is positioned on the bridge for travel in the longitudinal direction of the bridge. Extending from the square-shaped frame are truss members for supporting a circular track. A ring-shaped turntable is mounted for rotation on the track, and carries a chute which extends through the turntable, track, and bridge into the hold of the ship being loaded. Claim 1 specifies that the height of the scraploader is substantially equal to the deck-to-deck spacing of a hold.

7. Claims 2 and 3 are broader than claim 1; for example, claims 2 and 3 do not specify the height of the scraploader.

8. In all three of the claims, the chute is defined as being suspended on the turntable. The upper end of the chute is mounted directly on one portion of the turntable, and the opposite end of the chute is suspended by snubber means from an opposite portion of the turntable. The chute may be rotated 360° by rotation of the turntable.

*The Accused Structures.*

9. Defendant has used two constructions of the scraploader. The first construction was admittedly a direct copy of the invention and infringement of claims 2 and 3 was admitted in the pretrial order. The second construction of scraploader used by defendant is substantially the same as the first form, with the exception that defendant removed a coil spring from the snubber suspension means which supported the lower end of the chute from the turntable. As to the second form of scraploader, defendant denies infringement.

10. Prior to trial, defendant moved by summary proceeding for an order that the second form of scraploader did not infringe the claims of the Kierulff patent; the motion was granted. Plaintiff filed a motion for reconsideration with supporting affidavits and was permitted at trial to prove the issue of infringement. During trial, the Court vacated its previous order, thereby finding that the second form of scraploader infringed the Kierulff patent.

*Background of the Invention*
*Affecting the Presumption*
*of Validity.*

11. For many years, and at least since the termination of the Second World War, there was a serious problem in the scraploading industry in regard to techniques and machines for loading scrap efficiently, economically and profitably.

12. Defendant, prior to the war, was one of the largest scraploaders on the West Coast. However, after the War decided not to return to the scraploading business because the existing machines rendered the business unprofitable (TR–228, 235).

13. Defendant searched for a solution to the problem but found none until it saw Kierulff's invention (TR–229, 235).

14. Defendant admittedly copied Kierulff's invention, returned to the business, and is now one of the largest scraploaders on the West Coast (TR–445, 467).

15. The invention is admittedly a great commercial success and saves several thousands of dollars per shiploading.

16. The patent application was thoroughly examined by the Patent Examiner, who cited 19 U.S. and foreign patents which constituted the most pertinent prior art relied upon by defendant.

17. At least one element of the patented combination, namely, the ring-shaped turntable, is novel in the field of loading devices and, therefore, the A&P case does not apply.

18. Defendant relied upon 27 prior patents, and notwithstanding such number, its expert witness, as well as plaintiff's expert witness, testified that the claimed combination was novel (TR–280, 311, 312, 321).

19. The patents proffered by defendant as most pertinent, such as Patents Nos. 221,848, and 619,128 (TR–270), issued more than 60 years ago, and presumptively, defendant had knowledge of those patents when it decided that the known scraploading devices were inadequate to justify a return to the business after the War.

20. No one of the 27 patents relied upon by defendant, considered either alone or in combination with other patents, anticipates the claims of the Kierulff patent.

21. No prior patent is capable of yielding the results of the Kierulff invention.

22. In addition to the large number of prior patents cited by the examiner evidencing thorough consideration of the invention, the Kierulff application was involved in interference, which subjected the invention even to greater scrutiny by the Patent Office.

23. The Kierulff invention is a genuine contribution to the art, it has solved a long existing problem, and it has a utility not found in any of the prior art.

24. The Kierulff invention was not obvious to one having ordinary skill in the art to which the invention pertains.

*The Issue of Public Use.*

25. In the development of the patented invention, an earlier so-called jury rig was designed by Kierulff for a scraploading company named National Metals and Steel Corporation, hereinafter called National, which was operated by National four months prior to the year before Kierulff filed his application for letters patent.

26. Kierulff, the president of National, and the scraploading supervisor at National, namely, all those persons who had firsthand knowledge of the use of the jury rig, testified that the use was experimental.

27. The jury rig differed from the patented invention in several respects, one of the main differences being that the jury rig utilized a trapezoidal shaped turntable as distinguished from the ring-shaped turntable as described in the Kierulff patent. As a result of the difference in the shape of the turntable, and the relationship of the turntable to the supporting structure, the turntable is supported along its entire perimeter so as to resist bending due to the scrap impact. Further, the track is completely sheltered by the overlying turntable, so that the track is always protected against fouling or damage by the scrap. The weight of the chute and the weight of the scrap are also more uniformly distributed throughout the entire structure.

28. Since the jury rig was the first of the new design emerging from the development, its performance and capabilities were unpredictable, and for that reason National called the rig a "jury rig" (TR–116, 170VV, 170WW, 184, 185).

29. The jury rig was tested by actually loading scrap into the holds of ships. This was the only practical way for testing such a device, as it would be impractical, if not impossible, to simulate actual loading conditions in a laboratory, even assuming such laboratory were available.

30. The scraploader measured approximately 8 feet high, 30 feet long, and 17 feet across. When it was not in use, it was located on the dock, and when desired for use, a crane having a tall boom would lift it, carry it through the air and place it in position on the ship. In addition to the longshoremen on the dock, the ship was usually of foreign origin, and the ship's crew had freedom of the ship and the scrap yard. The rig, therefore, was necessarily used in view of those in the area, and it would have been impractical, if not impossible, to have obtained

a pledge of secrecy from each foreign crew and the longshoremen when the scraploader was in use. Further, there was no practical way of concealing the scraploader while in use.

31. After the scraploader was used one time, it failed and a new design, corresponding to the patented design, was made by Kierulff.

32. The jury rig was repaired and used only three times outside of the critical period of one year prior to the filing date of the Kierulff invention.

33. The design corresponding to the patented design was used only within the period of one year prior to the filing date of Kierulff's application.

34. Kierulff, in a letter long prior to this lawsuit, commented on the jury rig and referred to it as a pioneer experiment (TR–136).

35. The patented scraploader was of substantially different design from the jury rig, and the primary use of the jury rig was experimental.

*Issue of Prior Sale.*

36. Approximately one and one half months prior to the year before Kierulff's filing date, he submitted a proposal to defendant and offered to sell a scraploader corresponding to the proposal. The proposal illustrated a ring-shaped turntable and was rejected by defendant.

37. At the time that the proposal was submitted to defendant, there was no scraploader of the patented design in existence, and the operability of the proposed scraploader was undetermined.

38. The first scraploader to be made and operated corresponding to the design illustrated in the proposal was within one year of Kierulff's application date.

*The Issue of Prior Art.*

39. The prior patents relied upon by defendant do not anticipate the claims of Kierulff's patent, and Kierulff's invention represents a meritorious contribution to the art.

40. The ring-shaped turntable is not disclosed in any of the references relied upon by defendant and is a new element in the field of loading devices.

41. The patented invention satisfies the objective criteria of filling a long-felt want, copying and immediate adoption by defendant and other companies in the industry, outstanding commercial success specifically attributable to the patented invention, and thorough examination in the Patent Office.

42. The invention was not obvious to one having ordinary skill in the art to which the invention pertains.

43. The invention yields advantages not found in any of the prior art.

*Defendant's Rights.*

44. In May of 1955, National Metal and Steel Corporation, hereinafter referred to as National, employed Modern Crane and Conveyor Company, hereinafter referred to as Modern, to design and construct two shiploading structures. Accordingly, Modern, on or about June 19, 1955, sold and delivered to National two shiploading structures known as the "jury rigs" and shown in Exhibit AM.

45. In July or August of 1955, the "jury rigs" shown in Exhibit AM were modified by the addition of a "snubber spring". The modified "jury rigs" are shown in Exhibits BD and BE.

46. In July of 1955 National employed Modern to construct an improved design of a shiploading structure. Accordingly, in July of 1955, parts of the first 16 foot structure, which is shown in the patent in suit No. 2,919,042, was sold and delivered by Modern to National. The remaining substantial parts were supplied by National after October 15, 1955.

47. In July or August of 1955, National invited T. W. Buchholz, Vice President of defendant, to the National premises to see and observe the National shiploading structures, including the "jury rigs" shown in Exhibit AM, and the modified "jury rigs" shown in Exhibits BD and BE.

48. In July or August of 1955, T. W. Buchholz and Ray Ponsen, another employee of defendant, entered the National

premises to see and observe the National shiploading structures shown in Exhibits AM, BD and BE. At the time of said visit plaintiff was present, knew the nature and purpose of the visit, had the opportunity to inform Messrs. Buchholz and/or Ponsen that he objected to their seeing and observing the said shiploading structures, but failed to so do.

49. During the course of said visit, Messrs. Buchholz and Ponsen were invited back to see and observe the National shiploading structures shown in Exhibits AM, BD and BE in operation.

50. A few days after the invitation referred to in Finding 49, Messrs. Buchholz and Ponsen entered the National premises to see and observe the National shiploading structures shown in Exhibits AM, BD and BE in operation. At this time plaintiff was present, knew the nature and purpose of the visit, had the opportunity to inform Messrs. Buchholz and/or Ponsen that he objected to their seeing and observing the National shiploading structures shown in Exhibits AM, BD and BE in operation, but failed to so do.

51. A few days after the visit referred to in Finding 50, National gave T. W. Buchholz permission to send his fabricators to the National premises to sketch the National shiploading structures shown in Exhibits AM, BD and BE. At this time National gave T. W. Buchholz permission to build and use shiploading structures of the designs of the National shiploading structures shown in Exhibits AM, BD and BE. Plaintiff was fully aware of the fact that National had given defendant permission to make and use shiploading structures of the design of the National shiploading structures shown in Exhibits AM, BD and BE, and had the opportunity to inform the defendant, its officers, agents, or employees of his objections thereto and assert his rights in and to said shiploading structures, but failed to so do.

52. A few days after the events referred to in Finding 51, Robert H. Shanley, an engineer employed by Wilmington Welding & Boiler Works, acting as agent and on behalf of defendant, together with Ray Ponsen, were admitted on to the National premises and were permitted to make drawings of the National shiploading structures shown in Exhibits AM, BD and BE. Plaintiff was fully aware of the presence of Messrs. Shanley and Ponsen, of the nature and purpose of their visit, and was in a position to inform them that he objected to their making drawings of said shiploading structures, but failed to so do.

53. In August of 1955, plaintiff visited T. W. Buchholz for the purpose of selling defendant shiploading structures of the design shown in the patent in suit No. 2,919,042.

54. In the latter part of 1955, Wilmington Welding & Boiler Works sold and delivered to defendant three shiploading structures shown in plaintiff's Exhibit 4. Plaintiff knew that three shiploading structures shown in plaintiff's Exhibit 4 had been sold and delivered to defendant, and that defendant intended to use said shiploading structures in the ordinary course of its business, but failed to state any objection thereto.

55. In December of 1955, or January of 1956, plaintiff and Joseph Schapiro, president of National, visited the defendant's premises and observed the defendant's shiploading structures shown in plaintiff's Exhibit 4. At this time, plaintiff expressed no objection to defendant making, using or continuing to use said shiploading structures.

56. At no time during the period July, 1955, to January, 1960, did plaintiff voice any objection to defendant's construction, use or continued use of its shiploading structures shown in plaintiff's Exhibit 4, and/or assert any rights in and to said structures.

57. During the latter period of 1955, to January, 1960, plaintiff had countless opportunities to express his objections to defendant's construction, use and continued use of its shiploading structures shown in plaintiff's Exhibit 4 and assert his rights in and to said structures, but failed to so do.

58. It was not until January, 1960—more than four years after plaintiff first had knowledge of defendant's construction, use and intent to continue to use its shiploading structures shown in plaintiff's Exhibit 4—that plaintiff, for the first time, objected to defendant's use of said shiploading structures.

59. Plaintiff was under a duty to assert his rights and state his objections to defendant, its officers, agents, or employees when he first learned: that National had given defendant permission to see and observe its shiploading structures shown in Exhibits AM, BD and BE; that National had given defendant permission to copy, make, and use shiploading structures of the design of the shiploading structures shown in Exhibits AM, BD, BE; that defendant intended to build three shiploading structures; that in the latter part of 1955, three shiploading structures shown in plaintiff's Exhibit 4 had been constructed, sold and delivered to defendant; and that defendant intended to use and continue to use the three shiploading structures shown in plaintiff's Exhibit 4 in the ordinary course of its business.

60. Defendant did not know that plaintiff claimed any rights in and to the shiploading structures shown in Exhibits AM, BD, BE, and in the patent in suit No. 2,919,042, and in plaintiff's Exhibit 4, until January, 1960, and believed that the permission granted to it by National gave it the complete right to make and use the shiploading structures shown in Exhibits AM, BD and BE, and in the patent in suit No. 2,919,042.

61. As a result of plaintiff's action and lack of action, referred to in Findings 48 and 50 through 57, inclusive, plaintiff granted defendant an implied license by estoppel, somewhat in the nature of a shop-right, irrevocable, non-exclusive, non-assignable and royalty-free, to use and only to use, the three shiploading structures (Findings 54 through 59, inclusive) which in the absence of the license, infringe the patent in suit.

62. The license referred to in Finding 61 applies only to the machine or machines in operation at the time or before the patent was granted, and defendant may repair them (three) during their normal life.

## CONCLUSIONS OF LAW

■ 1. Claims 1, 2 and 3 of Patent No. 2,919,042 are valid as defining a meritorious invention constituting a genuine contribution to the art, and an invention not obvious to one having ordinary skill in the art to which the invention pertains (National Sponge Cushion Co. v. Rubber Corporation of California, 286 F.2d 731 (9th Cir., 1961)).

■ 2. The statutory bar of public use is not applicable because,

(a) The use of the jury rig was experimental (Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000).

(b) The design of the patented scraploader was substantially different from the design of the jury rig (Goodwin et al. v. Borg-Warner Corp. et al., 157 F.2d 267 (6th Cir., 1946)).

■ 3. The statutory bar of prior sale is not applicable because at the time that Kierulff submitted his proposal to defendant, there was no scraploader in existence corresponding to the proposal, and furthermore, the proposal was rejected by defendant. No scraploader corresponding to the patented scraploader was in existence more than one year prior to the filing date of the Kierulff application (Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corporation et al., 316 F.2d 459 (9th Cir., 1963)).

4. Plaintiff was under a duty to assert his rights and state his objections to defendant, its officers, agents, or employees when he first learned: that National had given defendant permission to see and observe its shiploading structures shown in Exhibits AM, BD, and BE; that National had given defendant permission to copy, make, and use shiploading structures of the design of the shiploading structures shown in Exhibits AM, BD, and BE; that three shiploading struc-

tures shown in plaintiff's Exhibit 4 had been constructed, sold and delivered to defendant; and that defendant intended to use and continue to use the three ship-loading structures shown in plaintiff's Exhibit 4 in the ordinary course of its business.

■ 5. Plaintiff granted defendant by his action and lack of action an implied license by estoppel, somewhat in the nature of a shop-right, irrevocable, non-exclusive, non-assignable and royalty-free, to use only the three machines in operation at the time or before the patent in suit No. 2,919,042 was granted.

6. Defendant may repair, "during their normal life", the three machines operated by defendant "at the time or before the patent (No. 2,919,042) was granted."

### AMENDED JUDGMENT FOLLOWING REMAND BY THE COURT OF APPEALS

This action came on for trial before the Court, Honorable William C. Mathes, District Judge, presiding, on the 18th, 22nd and 23rd days of August, 1961, and the issues having been duly tried, and a decision having been duly rendered, in accordance with the Amended Findings of Fact and Conclusions of Law following remand by the Court of Appeals,

It is ordered and adjudged

1. That plaintiff's Patent No. 2,919,-042 is valid.

2. That claim 1 is infringed by defendant's unmodified accused scraploader, and that claims 1, 2 and 3 of the aforesaid patent are infringed by defendant's modified accused scraploader.

3. That in accordance with the decision of the Court of Appeals for the Ninth Circuit filed March 26, 1963, 315 F.2d 839, defendant has an implied license "only to the machine or machines in operation at the time or before the patent was granted, and appellee (defendant) may repair them during their normal life."

4. That each party bears his or its own costs.